No. 34,534

Delores Taylor, *Appellee,* v. The F. W. Woolworth Company, *Appellant.*

(98 P. 2d 114)

Opinion filed January 27, 1940.

*C. H. Brooks, Howard T. Fleeson, Carl G. Tebbe, Wayne Coulson* and *Paul R. Kitch,* all of Wichita, for the appellant.

*Clarence R. Sowers* and *Claude E. Sowers,* both of Wichita, for the appellee.

The opinion of the court was delivered by

Hoch, J.: Plaintiff was awarded damages for personal injuries which she alleged were the result of eating part of an unwholesome sandwich served by the defendant company in a public eating place. Judgment was for $937, from which defendant appeals, and also from orders overruling motions for a new trial and for judgment notwithstanding the verdict.

Appellant contends: (1) that the verdict was procured by perjured and fraudulent testimony of the plaintiff and her doctor; (2) that the verdict was arrived at under the influence of passion and prejudice induced by improper and prejudicial statements made by plaintiff's counsel in his argument to the jury; and (3) that the damages awarded were excessive.

. The plaintiff, Delores Taylor, testified that about noon on Wednesday, September 12, 1938, she went to the store of the defendant company—the Woolworth store, in Wichita, Kansas—accompanied by her mother and her young son. They stopped at the eating place maintained in the store and she ordered a ham sandwich and ate about half of it; that it tasted "sort of moldy" and she handed it to her mother, who said it was "terribly molded and black," that the girl at the counter took it and threw it in the garbage can and she ordered another sandwich, that she ate part of it and got so sick she had to leave; that they went to the office of Doctor Chipps and Doctor Chipps gave her some medicine; that they were there about half an hour and then took a cab and went home and she stayed in bed all day; that she was worried about a radio singing contest that she was to take part in, and that she did sing that afternoon, but did not go to the club where she was accustomed to sing until the next night; that in the afternoon of the day she ate the sandwich she called Doctor Bernstorf and went to his office; that Doctor Bernstorf gave her some medicine to take home with her and that she had been taking it ever since until the week before the trial (which was in April, 1939), and that he then gave her a different kind of medicine for her nerves; that she had not been able to eat pork or ham and didn't eat at all for four days after eating the sandwich; that she had been nervous and could not eat the food that she ate before; that she fell off in weight from 112 or 115 to 96 pounds in two weeks and that she then weighed 102 or 103 pounds; that she had been filling singing engagements as many times as possible, but hadn't been able to do all her work; that she was doing radio work fifteen minutes a day. On cross-examination she testified that immediately after leaving the store they went to Doctor Chipp's office and home from there, that later she called Doctor Chipps, but he wasn't in his office, and then she called Doctor Bernstorf and went to his office, then went back home, and then to the radio station. She said that she did not know Doctor Bernstorf before and that he was recommended to her by a lady who lived in her mother's house; that she went to the radio station between four and five o'clock in the afternoon to take part in a contest and was there about twenty minutes; that she sang at a club the next day, Thursday, and on Friday, Saturday and Sunday nights, and as a prize for winning the contest was given a trip to Chicago on September 27, for an audition with one of the major broadcasting com-

panies; that she was in Chicago four days; that she saw Doctor Bernstorf every other day before she went to Chicago; that she started singing over the radio right after Thanksgiving and had been singing there every morning since January 1; that she had not refused any engagements at the radio station but had refused two programs from someone else and they were the only ones she had refused; that she went back to Chicago on November 12 for two weeks, during which time she rehearsed in the studio and sang one program on the radio; that she did not see a doctor while in Chicago but took with her a supply of medicine which Doctor Bernstorf had given her; that she sang three times a week over the radio until January 1 and six days a week since that time and did not miss a program after January 1; that she missed four programs before January 1 because she was too nervous and sick. Later on she testified that she went to Chicago the second time on October 12 or 13, instead of on November 12, and came back about November 1.

Doctor Chipps testified that the plaintiff came to his office and said that she was very sick and thought she had been poisoned by some food, that he examined her and found her pulse and color normal and that her heart wasn't exaggerated or weak, that she tried two or three times to vomit but couldn't vomit and that she didn't look ill; that he gave her a dose of alkaline powder; that she was in his office about thirty minutes; that in his opinion she was not ill from food poisoning, and that she was not poisoned by anything she ate at noon, as food poisoning would not develop that quickly; that he later saw the ham sandwich which was represented to be part of the one she had eaten, that the bread and meat appeared fresh and he suggested that it be taken to Mr. Kabler, a chemist and bacteriologist, for examination; that he was in his office the remainder of the afternoon after the plaintiff left.

Doctor Bernstorf testified that he first met the plaintiff on September 12, when she came to his office and complained of cramping and sickness of her stomach. She said she had been vomiting and was rather in a state of collapse; that she had eaten a sandwich which made her sick; that he had treated her since September 12 and she was still under his care; that she was suffering from food poisoning when he first saw her on September 12; that she had been weak, her blood pressure was down, she was losing some weight, had indigestion, that she would probably never be able to eat certain foods again and is probably allergic to pork; that he couldn't state

how long she would suffer from nervous disorders; that her singing made her nervous; that the poison food affected her nerves and that he had been giving her medicine to help her digestion and nervousness. On cross-examination he testified that he did not have his office records with him and could not tell how many times he had seen her, that it was around twenty or thirty times as nearly as he could recall; that when the plaintiff called at his office on September 12 she told him that Mr. Sowers, plaintiff's attorney in the action, had sent her to him. Later, on redirect examination, he testified that he imagined he had been mistaken when he said that Mr. Sowers sent the plaintiff to his office on September 12, because he found a notation on his record "Clarence Sowers on October 11." Later in the trial Doctor Bernstorf produced his office books and an office card purporting to show the office visits made by the plaintiff. Testifying therefrom he said that he saw seven patients at his office on September 12, that the plaintiff's name was fifth for that day, that he saw the plaintiff twenty-seven times up to and including April 15, 1939, and that on each occasion except that of September 12 and April 15 the plaintiff's name was shown as the last person he saw on each day, and that the record showed that on the days when the plaintiff called at his office he saw from four to twenty patients; that he didn't know why it was that his records showed that he saw the plaintiff on October 29 and November 7 when she was in Chicago at that time; that the last charge in his book on October 13 was "Laverne Taylor;" that Laverne was a patient of his and that he had scratched out "Delores" and written "Laverne" because when he was posting it he discovered that the entry wasn't right and that Delores had not been in that day; that "Laverne" is the last name which appeared on October 17 and that it had originally been written "Delores" but he had struck it out and inserted "Laverne" because the first entry was wrong and also that the same thing occurred as of October 22. He testified that Delores' name always appeared as the last patient of the day, except on the first and last visits, because she usually came late in the evening; that after the plaintiff's name in his record the notation always appeared "office visit," and that he didn't use that notation for any other patients because this was a case in litigation and he wanted to designate that she had made an office call.

Doctor Gouldner testified that he had examined the plaintiff the day before and found her a very nervous woman, with a high pulse

rate, highly excitable, but otherwise there was nothing abnormal about her; that based upon the history which she gave him and his examination it was his opinion that she did not suffer food poisoning on September 12, that no food poisoning is known to occur earlier than six to twelve hours after the digestion of food; that common food poisoning occurs after that time and is accompanied by cramps, vomiting and temperature of 102 to 103, and after two or three days the whole thing is over; that the other type of food poisoning is botulism, that it shows symptoms from twelve to thirty-six hours after the food is taken, and that it is fatal sixty-five percent of the time. He testified that her nervousness was associated with the condition of her eyes; that she had one glass eye and the other eye was affected in a way which caused it to continually vibrate.

Doctor Callahan testified that he had examined the plaintiff on the day he was testifying, and that he found her physical condition to be normal in all respects except that she was very nervous and "as to her eyes." He testified that ordinarily it takes food poisoning about four hours to develop after the food is eaten and that her condition of nervousness had no relation to a sandwich eaten by her on September 12. He said she told him that she became sick fifteen minutes after she had eaten the sandwich, but that food poisoning would not come on within fifteen minutes, as that would not give her time to assimulate the poison to produce the toxic condition; that if she had a severe case of food poisoning it would have lasted twenty-four to forty-eight hours; that the symptoms she was then complaining of had nothing to do with food eaten the previous September; that there might be some connection between the condition of her eyes and her nervousness; that ptomaine poisoning might cause loss of weight during the next week or two afterward; that the plaintiff had lost her left eye as a child; that she wore a glass eye and as a result of the injury has an eye "astigment" in the right eye which quite possibly would have a great deal to do with her nervous condition.

Mrs. Frank, plaintiff's mother, testified that her daughter couldn't see very well; that after she ate half of the sandwich she handed it to her; that the meat looked dark and the bread was green and black; that the girl at the counter threw it in a can and handed her another that she couldn't eat; that her daughter's lips were pale and her face was white. She told about the visit to Doctor Chipps'

office and later to Doctor Bernstorf's, and that after they had visited Doctor Bernstorf they went home, and that the plaintiff went to the radio station, and she went back to the defendant's store at three o'clock in the afternoon and talked to the manager. She also testified as to the plaintiff's physical condition after September 12.

Witness Shearman was qualified as an examiner of questioned documents and stated that he had been so testifying for more than twenty years and had devoted all of his time to that study since 1917. He testified in detail as to the separate entries in question in Doctor Bernstorf's records and said that the relative position of the pen and the paper was the same over a period of nearly two months, that in his opinion the entry "Delores Taylor" in the cases where it appeared as the last name on the respective pages had been made within a week because every entry was remarkably like the others as to position on the pages; that they were alike as to the notations following them; that they were much different from the other entries in the book in most instances; that the book had been in a constant position to the writer; that there were a few normal entries, namely on September 12, the first entry on October 11, the first entry on February 6, and an entry on February 27, which latter entry was not shown on the card; that in his opinion much of the card, if not all of it, was written at the same time, because of the tendency of the writer to go to the left side and because of the slight difference of ink color as between the entries; that the ink color of the entries in question were too consistent over a three-and-one-half-months period.

Vern L. Taylor testified that he had never been a patient of Doctor Bernstorf and that he was not in his office on October 13, 17 or 22, 1938. Ela Taylor, his wife, testified that she was treated in December, 1938, for a sore throat but she was not in his office at any time within sixty days prior to her December illness, as far as she could recall.

Miss Clinton, stenographer in Mr. Sowers' office, testified that she kept the names of all the persons who enter the office, and her books showed that the first time plaintiff came to the office was on October 11, 1938.

Employees of the store testified that subsequent to the complaint, a sandwich which they identified as the one in question was taken from the garbage can in which it had been thrown; that there was no indication that there was anything wrong with it and that it was

taken to Mr. Kabler for examination. Witness Kabler, having been qualified as a chemist and bacteriologist, testified that he examined the sandwich brought to him by an employee of the store, that he made a cursory examination of it at the time and then started cultures and chemical tests; that the bread was soft, moist and fresh and the ham clear, normal in color and texture and that there were no spots or discoloration under a high-powered hand lens on either the ham, bread or lettuce; that he made bacteriological culture tests which were negative for the three types of food poison organisms generally encountered; that he tested it for heavy metals and found none present; that he ground up the remainder of the sandwich and fed it to guinea pigs and they showed absolutely no effect of food poisoning.

A number of witnesses both for plaintiff and for defendant testified concerning the plaintiff's physical appearance and condition prior to and after September 12. Recital of that testimony, substantial but conflicting, is not required in presenting the issue here determined.

In the journal entry of judgment is noted the overruling of defendant's demurrer to the plaintiff's evidence, but the abstract does not show the demurrer nor the grounds assigned therein. Appellant, however, does not here urge the merits of the demurrer, but contends that the verdict was procured by fraudulent testimony, that it was contrary to the evidence, and that the trial court abused its discretion in refusing to set it aside and grant a new trial. In support of the motion for new trial there was submitted an affidavit of the county director of welfare to the effect that welfare payments had been made to the plaintiff by his office from August, 1937, until May, 1939, in the total sum of $506.52 cash and $121.56 in clothing, food, etc., and that subsequent to November 1, 1937, the plaintiff had received from $26.23 to $28.43 a month in cash as blind assistance, and that dental and medical services in the amount of $1.50 had been furnished in February, 1937. This affidavit was submitted in view of the following statements made by plaintiff's counsel in his opening argument to the jury:

"I am a lawyer representing this client. She is not a WPA worker. She is blind in one eye and the other one is defective, that is true. She is not a chiseler, because if she was a chiseler she and her little boy would be on WPA, but not doing that and not being a chiseler, she is trying to make a living and not charge the taxpayers with it, and yet they make us come into court and feel like a bunch of criminals."

Defendant's objection to these statements was overruled.

Certainly no discredit would necessarily attach to the plaintiff if she had received aid "charged to the taxpayers." But there was nothing in the evidence concerning the matter, and the comment was clearly intended to influence the jury by injecting matters outside the record. Although the comment was manifestly improper, and the affidavit presented on the motion for a new trial was pertinent, we cannot say that this particular comment alone, which the court permitted to stand, so prejudiced the rights of the defendant as to require a new trial. Nor is it our function to pass upon the weight of the evidence on the question of whether the plaintiff was injured by unwholesome food served by the defendant. That issue was for the jury to determine in the face of the conflicting testimony heretofore summarized. We are concerned, however, that the jury be permitted to determine it in a trial lawfully and properly conducted.

We come now to consideration of other statements made to the jury by plaintiff's counsel.

In his opening argument counsel said:

"They have brought in here paid experts and I am telling you they can pay experts; we can't. But they have brought in paid experts to testify the way they want their case and the way they want to present their evidence."

Objection was made to this statement on the ground that it was improper. The objection was overruled. Plaintiff's counsel then continued:

"You will notice that the court reporter is taking a record of my argument because of their great precautions of this big corporation on their appeal in the higher court."

Objection to this statement was sustained and the jury instructed to disregard it. Again counsel for plaintiff said:

"All these witnesses are working for the defendant and they are relying upon the defendant for their livelihood; even the doctors; even the chemist; even the rubber expert; they are all relying for their livelihood upon this corporation; this defendant."

Objection to that statement was overruled. In his closing argument plaintiff's counsel said:

"I have never yet tried a case on the other side of Mr. Fleeson but that he made the plaintiff feel like a thief."

Objection to that statement as an improper argument was sustained, but no direction given to the jury to disregard it. Other statements from plaintiff's argument have been heretofore referred to.

Statements complained of were highly improper, especially the statement that the defendant had "brought in paid experts to testify the way they want their case."

There was also submitted, as showing prejudice, on the motion for new trial the affidavit of one of the jurors to the effect that a woman juror had stated during the deliberations, and in the presence of the other jurors, that ". . . it cost 'Babs' Hutton more to get her count than the plaintiff was asking in this case and that she did not like 'Babs' because she had blondined her hair" ("'Babs" Hutton being a Woolworth heiress of considerable newspaper notoriety).

In extenuation of the improper remarks made by plaintiff's counsel, it is urged that they were incited by improper attacks upon him by counsel for the defendant. No such remarks are shown by the record before us, and we have no way of determining what basis, if any, there is for such allegation. Moreover, if such improper remarks were made by defendant's counsel it was the duty of opposing counsel to make proper objection and the duty of the court to see to it that proper bounds were observed. This court has consistently followed the general rule against imposing narrow and unreasonable limitations upon argument of counsel made to the jury. Counsel are entitled to comment freely upon the evidence, upon the credibility of witnesses where such comment is based upon facts appearing in the evidence, and to state their own views concerning the evidence. But countenance is not to be given to arguments based in no way upon the evidence or to appeals outside the record manifestly intended to create passion and prejudice on the part of the jury. Counsel have the unquestionable privilege to indulge in all fair argument in support of the contentions of their clients, but no right to appeal on the mere ground that the opposing party is a large corporation or of such wealth that a judgment against it would be no considerable burden upon it. It is impossible to lay down any definite rule as to when an improper argument by counsel, objected to at the time, will be ground for a new trial, and the circumstances of each case are controlling (2 R. C. L. 453). This matter is largely in the hands of the trial court. Where it appears, however, from the whole record that a sound discretion has not been exercised in controlling the argument of counsel and the right to a fair and impartial trial has been prejudiced, a new trial will be granted (2 R. C. L. 435). It is stated in 46 C. J. 108, that "If it is reasonably

doubtful whether harm has resulted from improper argument, such argument must be held to have been calculated to prejudice," citing *Hubb Diggs Co. v. Bell,* 116 Tex. 427, 293 S. W. 808, wherein it was said:

"If the trial court holds that under all the facts and circumstances in the case there exists no reasonable doubt as to whether harm has resulted from improper argument, and it appears from the record on appeal that under all the facts and circumstances such doubt does exist, the holding is erroneous." (p. 432.)

Upon examination of all of the facts and circumstances shown by the instant record it is our opinion that unwarranted latitude was permitted counsel for the plaintiff in his argument, outside the record, and that the only purpose and the probable effect of the improper comments heretofore quoted were to produce a prejudicial attitude toward the defendant on the part of the jury and thus prevent a fair and impartial trial.

The conclusions already reached make unnecessary a consideration of defendant's contention that the amount of the verdict was excessive.

The judgment is reversed with directions to grant a new trial.